# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | BANKRUPTCY CASE NO. 10-50494 |
| FAIR FINANCE COMPANY, ) | CHAPTER 7 |
| DEBTOR(S) ) | JUDGE MARILYN SHEA-STONUM |
| ) | |
| ) | |
| BRIAN A. BASH, TRUSTEE, ) | **CASE NO. 5:12cv992** |
| ) | JUDGE PATRICIA A. GAUGHAN |
| PLAINTIFF(S), ) | (ADVERSARY NO. 12-5108) |
| ) | |
| vs. ) | |
| ) | |
| SOMERSET CPAs, PC, ) | |
| ) | **MEMORANDUM OPINION RE:** |
| DEFENDANT(S). ) | **DEFENDANT'S MOTION TO DISMISS** |

Before this Court is defendant's motion seeking dismissal of plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) [made applicable in bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7012] for failure to state a claim upon which relief can be granted (the "Motion to Dismiss") and plaintiff's response thereto. The complaint sets forth two counts against defendant. Count I alleges actual fraudulent transfers pursuant to 11 U.S.C. §§ 544(b)(1), 550(a); Ohio Revised Code ("ORC") § 1336.04 and Indiana Code ("IC") § 32-18-2-14. Count II alleges constructive fraudulent transfers pursuant to 11 U.S.C. §§ 544(b)(1), 550(a); ORC § 1336.05(A) and IC § 32-18-2-15.

## GENERAL BACKGROUND FACTS

In addition to thirty one paragraphs of background information, the complaint sets forth over sixty paragraphs of alleged facts applicable to both counts [Compl. ¶¶ 32-97] (collectively, the "Common Allegations"). Pursuant to the Common Allegations, plaintiff contends, *inter alia*, the following:

1. Debtor was founded in 1934 and operated by the Fair family until its purchase in 2002 by Timothy Durham ("Durham") and James Cochran ("Cochran"). [Compl. ¶ 32].

2. Debtor was an Akron, Ohio based factoring company which borrowed by selling "investment certificates" to local individuals and used the proceeds to purchase accounts receivable. [Compl. ¶ 33].

3. After Durham and Cochran purchased Fair Finance in 2002, they shifted the company's primary business from factoring third party accounts receivable to making loans to debtor's parent, Fair Holdings, Inc. ("FHI") and other related entities. FHI would then loan debtor's funds to insiders such as Durham, Chochran, DC Investments "("DCI"), Obsidian Enterprises, Inc. ("Obsidian") and many other failed or failing business owned or controlled by Durham (collectively, the "Insider Loans" to "Insiders"). [Compl. ¶ 36].

4. Durham had FHI purchase debtor in January 2002 to fund Durham's failing businesses at Obsidian and to fund his personal invesments. [Compl. ¶ 37].

5. Durham commenced causing debtor to make the Insider Loans the day after FHI purchased debtor and by the end of 2002, Durham had caused debtor to loan more than $30 million to FHI. [Compl. ¶ 38].

6. The balance of the Insider Loans owed to debtor reached $82 million by the end of 2004, $137 million by the end of 2006, $167 million by the end of 2007 and $228 million by September 2009. [Compl. ¶ 39].

7. From 2002 to 2009, the balance due to investors on investment certificates increased from $39 million under the Fair family's ownership in 2001 to $208 million in September 2009. [Compl. ¶ 40].

8. Debtor and FHI made the Insider Loans without regard to whether the borrower had the ability to repay those loans. [Compl. ¶ 41].

9. Debtor received no significant payments on the Insider Loans. [Compl. ¶ 42].

10. Debtor was insolvent by the end of 2002 because it had incurred significant new investment certificate debts and used the proceeds to make nearly worthless Insider Loans. [Compl. ¶ 44].

11. Since the Insider Loans produced no significant revenue for debtor and since debtor had to repay principal and interest on the money it borrowed to make the Insider Loans, by the end of 2003 debtor has become a Ponzi scheme as it did not have enough cash to pay its investors without borrowing the money from new investors. [Compl. ¶ 45].

12. The Insider Loans were generally routed through multiple entities. Usually debtor first loaned money to FHI, which would loan the money to Obsidian or other insiders. [Compl. ¶ 49].

13. After debtor's previous auditors, BGBC Partners, LLP ("BGBC") refused to issue an unqualified audit report on debtor's and FHI's 2003 financial statements, Durham or Snow fired BGBC and defendant was hired to perform the audit of debtor and FHI. [Compl. ¶ 56].

14. Defendant was provided a detailed letter drafted by BGBC in February 2005 conveying serious concerns about FHI's loan portfolio, which upon information and belief, defendant obtained at approximately the same time it began the audit. [Compl. ¶ 57].

15. Specifically, the February 2005 letter questioned whether the Insider Loans were in fact loans, or if they were truly distributions of corporate assets to Durham and Cochran, noting that in many instances loan terms were "obviously outside the normal credit facility relationships," such as "loans [that] have been written or amended to reflect terms requiring no payment of principal or interest until maturity[,]" many of which "have also been amended to add to the borrowing capacity of the borrower." [Compl. ¶ 58].

16. The February 2005 letter also drew attention to the "increasing [Insider Loan] balances, erratic or no payment activity on [Insider Loans], continued deteriorating financial condition of the borrowing entities" and FHI's inability to provide BGBC with documentation of procedures for underwriting, monitoring and reviewing the collateral of its Insider Loans. [Compl. ¶ 59].

17. The February 2005 letter also showed that BGBC was considering issuing a qualified audit opinion questioning whether FHI and Debtor were going concerns. [Compl. ¶ 60].

18. In June 2005, employees of defendant met with BGBC employees to discuss BGBC's concerns with debtor's financial statements. At that meeting, BGBC employees and employees of defendant discussed the concerns that led BGBC to refuse to issue an unqualified audit opinion, including those relayed in the February 2005 letter. [Compl. ¶ 61].

19. Defendant released a consolidated audit report on debtor and FHI's 2003 and 2004 financial statements on or about Septembmer 30, 2005. [Compl. ¶ 62].

20. In 2006, defendant completed most of the fieldwork on debtor's and FHI's 2005 financial statements, but never issued an audit report. [Compl. ¶ 63].

21. Defendant prepared working draft financial statements for 2005 that estimated that FHI and debtor were insolvent by approximately $25 million at the end of 2005 and had lost approximately $20 million in 2005. [Compl. ¶ 64].

22. Defendant made this determination after considering the application of the accounting pronouncement FIN 46(R), which required consolidation of DCI, Obsidian, and other entities controlled by Durham and after determining that loans comprising approximately 90% of FHI's Insider Loan portfolio were impaired and could not be valued at their face value on debtor's books. [Compl. ¶ 65].

23. Debtor's management refused to reflect debtor's insolvency on its 2005 financial statements, and so defendant prepared a working draft audit opinion opining that the financial statements of debtor and FHI did not present those entities' financial condition fairly in accordance with generally accepted accounting principles. Defendant was fired by Durham or Snow in August 2006 before issuing that adverse opinion. [Compl. ¶ 66].

24. In July 2006, defendant revoked its consent for debtor to provide defendant's 2004 audit opinion to investors or regulators because the opinion was "no longer appropriate." [Compl. ¶ 67].

25. From June 2005 onwards, defendant knew that FHI had no significant assets other than Insider Loans, that FHI relied upon debtor for funds, that FHI could not repay debtor if the Insider Loans made by FHI did not perform, and that there was a significant risk that the Insider Loans would not perform. [Compl. ¶ 68].

26. Defendant continued to provide services to Insiders even though it knew or should have known or was willfully blind to the fact that its fees were functionally paid for by debtor through a series of integrated Insider Loans for which debtor would receive no value because the loans were unlikely to be repaid. [Compl. ¶ 69].

27. By June 2005, when defendant learned of BGBC's concerns, and that BGBC had been fired for raising those concerns, defendant knew, or should have known, or was willfully blind to the fact that DCI, FHI, Obsidian and Obsidian's subsidiaries were insolvent, could not fund their operations without loan draws from debtor, that debtor would likely never be repaid on these loans, and that any payment defendant received from these entities would be the result of a series of integrated loans from debtor to the Insiders, constituting a single economic transaction, which was in substance a transfer from debtor to defendant. [Compl. ¶ 77].

27. Nevertheless, defendant continued to provide accounting, tax, consulting or other services to Insiders after June 2005. [Compl. ¶ 78].

28. As of June 2005, defendant knew that essentially all of the assets of FHI and DCI were Insider Loans. [Compl. ¶ 80].

29. As of June 2005, defendant knew, or should have known, or was wilfully blind to the fact that the Insider Loans belonging to FHI and DCI had very little value and were better characterized as distributions to Durham or equity investments in insolvent companies. [Compl. ¶ 81].

-6-

30. In addition, after June 2005, defendant uncovered additional evidence that its fees from FHI, DCI or DC Investments Leasing would be paid through a series of integrated loans from debtor to the Insiders and that its fees would be paid functionally by debtor. [Compl. ¶ 82].

31. By September 2005, defendant had completed the audits of debtor and FHI and knew, or should have known, or was willfully blind to the fact that FHI and DCI did not generate any significant actual cash flow except by borrowing from debtor, that debtor was insolvent if those entities could not collect on their Insider Loans, and that it was unlikely debtor would be able to recover its loans from FHI and DCI. [Compl. ¶ 83].

32. By May 2006, defendant had determined on a preliminary basis that debtor and FHI were insolvent by approximately $25 million, primarily because of Insider Loans that were unlikely to be repaid. [Compl. ¶ 84].

33. From no later than June 2005, defendant knew, should have known, or was willfully blind to the fact that the fees it was paid by DCI, DCI Leasing, FHI, Obsidian, Obsidian's subsidiaries, DW Leasing and any other Insiders were the fruits of a series of interlocking loans from debtor to those entities, that the economic substance of the transactions was that debtor paid defendant for doing work for other entities, and that debtor would receive no value in exchange for those transactions because defendant's work was not valuable to debtor and entities paying defendant lacked the ability to repay their Insider Loans. [Compl. ¶ 95].

34. Defendant knew, or should have known, or was willfully blind to the fact that fees it received from DCI, FHI, DC Investments Leasing, Obsidian and its subsidiaries were functionally paid by debtor through a series of interlocking loan transactions and that debtor would not receive any

value in exchange for the fees because those entities were insolvent and relied entirely on debtor for financial support. [Compl. ¶ 96].

35. DCI, FHI and Obsidian made transfers totaling at least $760,454.90 to defendant as listed on Exhibit A to the Complaint (collectively, the "Transfers"). [Compl. ¶ 97].

## DISCUSSION

A. *The Standard for Dismissal Under Federal Rule of Civil Procedure 12(b)(6)*

Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure [made applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7008], a complaint must contain "a short plain statement of the claim showing that the pleader is entitled to relief." While such standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009), *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, the complaint must include facts that, if accepted as true, are sufficient "to raise a right to relief above a speculative level" and "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court must accept all well-pleaded factual allegations in the complaint as true, the Court is not required to "accept as true a legal conclusion couched as a factual allegation." *Hensley Mfg., Inc.*, 579 F.3d at 609 (quoting *Twombly*, 550 U.S. at 555).

B.  *Transfer of Assets of Debtor*

Both counts of the complaint are based upon 11 U.S.C. § 544 and applicable state law. Section 544 of the Bankruptcy Code provides that, as of the commencement of the case, "the trustee may avoid any transfer *of an interest of the debtor* in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502." 11 U.S.C. § 544(b)(1) (emphasis added). In the Motion to Dismiss, defendant does not separately challenge each count of the complaint but instead contends that plaintiff has failed, as a matter of law, to state any claim for relief because there has been a failure to allege any transfer of an asset of debtor.

Defendant correctly points out that the complaint does not include any allegations that debtor transferred funds directly to defendant. Such failure is not, however, fatal to the complaint because in this particular case, the trustee is seeking to collapse a series of transactions that began with a transfer of funds by debtor and ended with a transfer of funds to defendant.

> [A] claim for a fraudulent transfer may be alleged based on 'collapsing' a series of transactions where the transactions, taken as a whole, diminish the value of the debtor's estate and are marked by either a transfer made by the debtor for less than fair consideration or a transfer made by the debtor with actual fraudulent intent, and the party from whom recovery is sought had actual or constructive knowledge of the entire scheme that renders the transfer fraudulent.

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distr., Inc.)*, 379 B.R. 5, 22 (Bankr. E.D.N.Y. 2007). *See also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995); *Official Comm. of Unsec. Creditors v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 348 (Bankr. W.D.Pa. 2006) ("In determining whether a series of transactions should be 'collapsed' into a single integrated one, courts focus not on the form of the transaction but on its substance - especially the knowledge and intent of the parties involved in the transaction and whether there was an overall scheme to defraud creditors.")

The trustee has specifically alleged that the Transfers were part of a single, integrated transaction that, taken together, diminished the value of debtor's estate. *See* Compl. at ¶¶ 11, 69, 77, 82, 83, 85, 88, 93, 95, 96. The trustee has further alleged that such Transfers were made by debtor for less than fair consideration or were made by debtor with actual fraudulent intent and that defendant knew or should have known of debtor's scheme. *See e.g.,* Compl. at ¶¶ 4, 11, 12, 65, 68, 69, 77, 82, 83, 88, 93, 95.

The purpose of a motion to dismiss for a failure to state a claim upon which relief could be granted is to test whether the facts alleged entitle plaintiff to some form of legal remedy. Assuming, as this Court must in this procedural context, that all of the foregoing factual allegations are true, it is "plausible" that plaintiff could successfully advance the argument that the transactions at issue should be "collapsed." Should plaintiff ultimately prevail in advancing that "collapsing" theory, then an interest of the debtor in property would have been transferred to defendant and the threshold requirement of 11 U.S.C. § 544 will have been met.

C. *Heightened Pleading Standard*

Defendant also contends that the complaint should be dismissed because plaintiff has failed to meet the elevated pleading standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure [made applicable in bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7009]. Again, defendant does not differentiate between the two separate counts of the complaint.

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *See Power & Telephone Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (recognizing that a plaintiff asserting fraud

must, at a minimum, allege the time, place and content of the misrepresentations; the defendant's fraudulent intent; the fraudulent scheme; and the injury resulting from the fraud). The purpose of Rule 9(b)'s heightened pleading requirement is to provide a defendant with notice of the specific conduct with which it was charged, protect it from "fishing expeditions and strike suits" and protect it from "spurious charges of immoral and fraudulent behavior." *United States ex rel. Bledsoe v. Comm. Health Systems, Inc.*, 501 F.3d 493, 510 (6th Cir. 2007).

In his response, plaintiff analyzes Rule 9(b) as to each separate count of the complaint and argues that the heightened pleading requirements do not apply to claims of constructive fraud. Plaintiff further contends that, even if Rule 9(b)'s heightened pleading standard is applied to both counts, the factual allegations in the complaint are not so devoid of detail to preclude defendant from a reasonable and fair opportunity to prepare a defense. The Court need not discuss whether or not Rule 9(b) should be more liberally construed in this case because it concludes that plaintiff's complaint - as to both counts - satisfies the standards of that rule.

The trustee's complaint contains detailed factual allegations that specifically identify fraudulent conduct which, if taken as true, would establish the "actual intent to hinder, delay, or defraud" element of an actual fraudulent transfer claim. *See* Compl. at ¶¶ 32-55. The complaint also contains detailed factual allegations as to the transfers at issue being made for less than reasonably equivalent value, *see* Compl. at ¶¶ 4, 10, 13, 41, 47, 54, 55 as well as debtor's insolvency, *see* Compl. at ¶¶ 6, 41, 44, 60, 64, 65. The complaint also contains detailed factual allegations that specifically identify each of the Transfers that the trustee seeks to avoid, including an identification of the recipient, amount and dates of those transfers. *See* Compl. at ¶¶ 103-107, 113-115, Ex. A.

In addition to the foregoing, the Court notes that the complaint specifically alleges that debtor was operated as a Ponzi scheme and sets forth detailed facts to support this allegation. *See* Compl. at ¶¶ 32-46. At this stage of the pleadings the Court must assume that such allegations are true and, as such, debtor's actual intent to hinder, delay or defraud creditors may be inferred from its operation as a Ponzi scheme. *See, e.g., Sec. and Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *Conroy v. Shott*, 363 F.2d 90, 96 (6th Cir. 1966); *Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 307 (S.D.N.Y. 2010); *Ivey v. Swofford (In re Whitley)*, 463 B.R. 775, 781 n.2 (Bankr. M.D.N.C. 2012) (and cases cited therein); *Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Capital, LLC)*, 396 B.R. 184, 192-193 (Bankr. D.S.C. 2008) (and cases cited therein).

## CONCLUSION

Based upon the foregoing, the Court finds that defendant has failed to demonstrate that plaintiff's claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted and that the Motion to Dismiss should be denied. The Court will prepare and file a separate document (which will incorporate this Memorandum Opinion by reference) to submit to the District Court for its review.

*/s/ Marilyn Shea-Stonum*
Honorable Marilyn Shea-Stonum

AUG 0 3 2012

cc (*via* electronic mail):   Joseph Esmont, Counsel to Plaintff
Mark Phillips, Counsel to Defendant